UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

----------------------------------------------------------------------X

```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED:  4/27/2020
```

BRIAN COLBERT,

                       Plaintiff,

        -v-

FSA STORE, INC., HEALTH-E COMMERCE, and
JEREMY MILLER

                    Defendants.

----------------------------------------------------------------------X

19-cv-9828 (LJL)

OPINION & ORDER

LEWIS J. LIMAN, United States District Judge:


On October 24, 2019, Brian Colbert ("Plaintiff" or "Colbert") brought this employment discrimination action against his former employer, FSA Store, Inc. ("FSA Store" or the "Company"), Health-E Commerce, and individual defendant Jeremy Miller.  *See* Dkt  No. 1. Colbert alleges that Defendants discriminated against him on the basis of race in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. 2000e *et seq.* ("Title VII"), Section 1981 of the Civil Rights Act of 1866 *et seq.* ("Section 1981"), New York State Human Rights Law, N.Y. Exec. Law § 290 *et seq*. (''NYSHRL''), and the New York City Human Rights Law, N.Y. City Admin. Code § 8–107 *et seq*. (''NYCHRL'').  Colbert also alleges that defendants FSA Store and Health-E Commerce retaliated against him in violation of Title VII, Section 1981, and NYSHRL and NYCHRL.

Defendants now move to dismiss the federal discrimination claims under Title VII and Section 1981 and the claims against Miller as an aider and abettor.  *See* Dkt. No. 26.  For the following reasons, the motion is DENIED.

## BACKGROUND

The facts stated below are drawn from the Complaint and accepted as true, as is required at the motion to dismiss stage.  FSA Store is an e-commerce business that, *inter alia*, sells flexible spending account and health savings account eligible products and services to consumers.  Compl. ¶ 11.  Defendant Miller is FSA's founder and Chief Executive Officer ("CEO").  *Id*. ¶ 18.

Colbert is African-American.  He was hired by FSA Store in January 2017 to fill the position of Chief Revenue Officer ("CRO").  In that position, he was responsible for building FSA Store's digital marketing and sales capabilities.  *Id*. ¶¶ 27-28.  During his tenure at FSA Store, Colbert was the only African-American employee in a senior management position.  *Id*. ¶47.

Colbert alleges that during his tenure at FSA Store, his successful performance as CRO earned him praise and recognition within the company, *Id*. ¶ 46, and that the Company achieved positive results.  Among other things, FSA Store experienced an increase in revenue of 45% in the first quarter as compared to the prior year.  Colbert conceived and implemented new strategies for managing strategic partnerships and sales and marketing operations, and he achieved successful branding and company development initiatives.  *Id*. ¶¶ 34-35, 38, 44. Notwithstanding these results, Colbert's employment at FSA Store was terminated in July 2017, less than six months from when his employment began.  *Id*. ¶ 80.

Plaintiff claims that his employment was terminated because of his race.  His allegations focus on the conduct and comments of Miller, the CEO.  He alleges that Miller repeatedly "stressed to Colbert that he was expected not to act 'too black'"; Miller told Colbert to be

"mindful that, as an African-American man, [Colbert] was 'culturally different'" from the majority of FSA Store Employees; and Miller instructed Colbert he should "'adapt to the Company's 'dominant' culture." *Id*. ¶¶ 49-50.  Plaintiff also alleges that Miller made a number of comments about him that reflected racial stereotyping and a racial animus.  Miller "regularly question[ed] Colbert about his 'athletic skills' and 'athletic prowess,' and ask[ed] him whether he had been admitted to Duke [University] on an athletic scholarship," and instruct[ed] Colbert to be "less intimidating" to other FSA Store employees without identifying any intimidating conduct, but emphasizing Colbert's "'cultural distinctiveness.'"  *Id*. ¶ 52-55.

Plaintiff further alleges that Miller, and, by extension, FSA Store, singled him out for negative treatment.  He alleges that Miller denied Colbert opportunities to meet with him and receive feedback, *id*. ¶ 57-60, and that among company executives, Colbert was uniquely required, at Miller's direction, to submit a written document summarizing his direct contributions to the Company's financial performance as a precondition to receiving a bonus to which he was contractually entitled.  *Id*. ¶¶ 61-63.  FSA Store and Miller terminated Colbert's employment less than a month after he had expressed a concern over increasing racial diversity in the ranks of FSA Store's senior leadership—a concern which Miller allegedly rebuffed.  *Id*. ¶¶ 68-72, 80. Plaintiff alleges that approximately one week after raising concerns about a lack of diversity, Miller summoned him to an impromptu six-month performance evaluation.  At the evaluation, Miller stated that Colbert had achieved a number of "wins" in his tenure and was well-positioned to succeed, but raised concerns that Colbert had not assimilated into the Company's "dominant culture," citing unspecified concerns about Colbert's communication with certain unnamed members of company leadership and board members.  *Id*.  ¶¶ 73-79.

# LEGAL STANDARD

To survive a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim upon which relief can be granted, a complaint must include "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 554, 570 (2007)).  "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.*  The ultimate question is whether "[a] claim has facial plausibility, [i.e.] the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678.

Title VII makes it unlawful for an employer "'to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's color, religion, sex, or national origin' . . . It requires a plaintiff asserting a discrimination claim to allege two elements: (1) the employer discriminated against him (2) because of his race, color, religion, sex, or national origin." *Vega v. Hempstead Union Free Sch. Dist.*, 801 F.3d 72, 84 (2d Cir. 2015) (quoting 42 U.S.C. 2000e-2(a)(1)).

Thus, Title VII it makes it unlawful for an employer to take an adverse employment action against an employee because of the employee's membership in a protected class. *See Vega*, 801 F.3d at 84.  An adverse employment action is a "material[] adverse change in the terms of conditions of employment." *Galabya v. N.Y.C. Bd. Of Educ.*, 202 F.3d 636, 640 (2d Cir. 2000).  It is "one which is more disruptive than a mere inconvenience or an alteration of job responsibilities.  Examples of materially adverse changes include termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of

benefits, significantly diminished material responsibilities, or other indices unique to a particular situation." *Vega*, 801 F.3d at 84 (internal citations and quotations omitted).  "[A]n action is 'because of' a plaintiff's race, color, religion, sex, or national origin where it is was a 'substantial' or 'motivating' factor contributing to the employer's decision to take the action." *Vega*, 801 F.3d at 86 (internal citations and quotations omitted).

A plaintiff can meet his burden of pleading that the adverse employment decision was motivated at least in part by an impermissible reason "through direct evidence of intent to discriminate or by indirectly showing circumstances giving rise to an inference of discrimination." *Vega*, 801 F.3d at 87.  In the absence of "direct evidence of discrimination," such an inference can give rise from the pleading of facts that would plausibly support "that the plaintiff is a member of a protected class, was qualified, suffered an adverse employment action, and [that there is] at least minimal support for the proposition that the employer was motivated by discriminatory intent." *Littlejohn v. City of New York*, 795 F.3d 297, 311 (2d Cir. 2015).

At the motion to dismiss stage, a plaintiff "need only give plausible support to a minimal inference of discriminatory motivation." *Littlejohn*, 795 F.3d at 306, 311; *see Id*. at 310 (noting the relationship between the *McDonnell Douglass* burden-shifting framework and the pleading standard in *Iqbal*, and concluding "[t]o the same extent that the *McDonnell Douglas* [framework] reduces the facts a plaintiff would need to *show* to defeat a motion for summary judgment prior to the defendant's furnishing of a non-discriminatory motivation, that presumption also reduces the facts needed to be *pleaded* under *Iqbal*") (emphasis original); *see also McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973) (setting out the burden-shifting framework that governs Title VII cases).  "[A]llegation of facts supporting a minimal plausible inference of discriminatory intent suffices . . . because this entitles the plaintiff to the temporary presumption

of [discriminatory motivation established under] *McDonnell Douglas* until the defendant furnishes its asserted reasons for its action against the plaintiff." *Doe v. Columbia Univ.*, 831 F.3d 46, 55 (2d Cir. 2016).

"An inference of discrimination can arise from circumstances including, but not limited to, 'the employer's criticism of the plaintiff's performance in ethnically degrading terms; or its invidious comments about others in the employee's protected group; or the more favorable treatment of employees not in the protected group; or the sequence of events leading to the plaintiff's discharge.'" *Littlejohn*, 795 F.3d at 312 (quoting *Leibowitz v. Cornell Univ.*, 584 F.3d 487, 502 (2d Cir. 2009)).

"Discrimination claims under Title VII . . . are subject to the same standards as those under § 1981 . . ." *Sosa v. New York City Dep't of Educ.*, 368 F. Supp. 3d 489, 521 (E.D.N.Y. 2019) (citing *Littlejohn*, 795 F.3d at 312, 320-21; *Vega*, 801 F.3d at 88-89). "Employment discrimination claims brought under the NYSHRL are evaluated under the same standards that govern Title VII." *Xiang v. Eagle Enterprises, LLC*, 2020 WL 248941, at *5 (S.D.N.Y. Jan. 16, 2020) (citing *Weinstock v. Columbia Univ.*, 224 F.3d 33, 42 n.1 (2d Cir. 2000). Claims under NYCHRL's provisions are construed more broadly than state or federal discrimination claims. "Thus, even if the challenged conduct is not actionable under federal and state law, federal courts must consider separately whether it is actionable under the broader New York City standards." *Mihalik v. Credit Agricole Cheuvreux N. Am., Inc.*, 715 F.3d 102, 109 (2d Cir. 2013) (internal citations and quotation marks omitted). Because, for the reasons stated below, Defendant's motion to dismiss is denied as to federal and state law claims, the Court also denies the motion as to the NYCHRL claim and need not reach its broader construction.

## DISCUSSION

### A.    Discrimination claims under Title VII, Section 1981, NYSHRL, and NYCHRL

Plaintiff's 133-paragraph complaint comfortably satisfies the standards for pleading a prima facie case of race discrimination under Title VII and the related state and city anti-discrimination laws.  There is no dispute that he pleads he is a member of a protected class, that he was qualified for the position, and that he suffered an adverse employment action.  *See* Def. Mem. 5-6, Dkt. No. 27; *Littlejohn*, 795 F.3d at 307.

Plaintiff also pleads facts showing that his termination was "because of" his membership in a protected class.  In particular, Plaintiff pleads both "direct evidence of intent to discriminate" and "circumstances giving rise to an inference of discrimination."  *Vega*, 801 F.3d at 87.  The Complaint alleges that regularly in the course of his employment, his direct supervisor Miller made a number of comments harping on Colbert's race, including that he should not be "too black," that he is "culturally different" and that he should "adapt" to the Company's "dominant culture."  A jury could readily reach the plausible inference from that evidence that Colbert's termination by Miller only months after Miller made those comments—and indeed one week after Miller reiterated a concern over Colbert's "cultural" differences—was because of Colbert's race.  *See Collazo v. County of Suffolk*, 163 F. Supp. 3d 27, 47 ("The temporal proximity of [the] incidents [at issue] to the adverse employment actions raises an inference of discrimination."); *Schreiber v. Worldco, LLC*, 324 F.Supp.2d 512, 518 (S.D.N.Y.2004) ("Verbal comments constitute evidence of discriminatory motivation when a plaintiff demonstrates that a nexus exists between the allegedly discriminatory comments and a defendant's decision to discharge the plaintiff.") (citation omitted); *Howe v. Town of Hampstead*, 2006 WL 3095819, at *7 (E.D.N.Y. Oct. 30, 2006) (a sufficient nexus exists if the comments were made by the decision-

maker); *Levy v. Legal Aid Soc.*, 408 F. Supp. 3d 209 (E.D.N.Y. 2019) ("Direct evidence of discrimination may exist . . . in the form of disparaging comments regarding a plaintiff's protected class.").

The Complaint also asserts that Miller, the ultimate decisionmaker on Colbert's employment, made a number of comments that can be plausibly be construed to reflect racial stereotyping or constitute coded racial comments such as about Colbert's presumed "athletic skills" or "athletic prowess" and whether Colbert had been admitted co college on an athletic scholarship.  *Id.* ¶ 52-55;  *See Windsor v. Rockefeller Ctr/Tishman Speyer*, 2002 WL 1467834 (S.D.N.Y. 2002) (finding an inference of discrimination at the summary judgment stage on the basis that an employer hired "few African-Americans" and issued "possibly stereotypical comments," such as that the employee, who was African-American, should not "wear [his] pants hanging down below [his waist]").

Finally, a plausible inference of discrimination arises from the fact that Colbert—alone among FSA Store employees—was subject to employment requirements and burdens to which other persons who were not African-American were not subject, such as being singled out among his colleagues to provide written justification for his annual bonus.  *Id.* ¶ 57-63.  *See, e.g.*, *Belabbas v. Inova Software, Inc.*, 2017 WL 3669512, at *1-2 (S.D.N.Y. Aug. 24, 2017) (sustaining a claim under Section 1981 where a female plaintiff alleged she was given different assignments from her male colleagues and was subject to "misogynistic and discriminatory comments" in the office).

Defendant's argument amounts to the claim that because FSA Store (and presumably Miller) knew of Colbert's race when FSA Store hired him it could not have discriminated against him on the basis of race when it fired him approximately six months later.  Def. Mem. 6-9, Dkt.

No. 27; Def. Reply 4-6, Dkt. No. 31.  It thus invokes the "same actor inference" that has been

applied to support the notion that where the same actor is responsible for hiring and

administering an adverse employment action against a plaintiff, it is "difficult to impute to [the

actor] an invidious motivation that would be inconsistent with the decision to hire." *Martin*, 704

F. Supp. 2d 202, 225 (E.D.N.Y. 2010) (quoting *Grady v. Aff. Cent., Inc.*, 130 F.3d 553, 560 (2d

Cir. 1997)).

There are two ready answers to that argument.  First, as Plaintiff notes, the Complaint

does not allege that Miller was the person who hired Colbert.  It alleges that Colbert was offered

the position of CRO after "*inter alia*, meeting twice with FSA Store's Vice President of Strategy,

Rida Wong, meeting with one of the members of FSA Store's Board of Directors and attending a

social function with a number of FSA Store employees."  Compl. ¶ 24.  At this stage, taking the

allegations of the Complaint as true, it is not even clear that the same actor inference would

apply.  *See Carlton v. Mystic Transp., Inc.*, 202 F.3d 129, 132 (2d Cir. 2000) (it is a premise of

the "same actor inference" that the "person who fires an employee is the same person that hired

him").

Second, the same actor inference does not here suffice to overcome the plausible

inference of discrimination otherwise plead.  The same actor inference is "typically applied at

summary judgment,"  *Palmer v. Shchegol*, 406 F. Supp. 3d 224, 233 (E.D.N.Y. 2016) (citing

*King v. U.S. Sec. Assocs., Inc*. 2012 WL 4122025, at *7 (S.D.N.Y. Aug. 22, 2012), *report and

recommendation adopted*, 2012 WL 4327396, at *1 (S.D.N.Y. Sept. 18, 2012)), and "[e]ven

then, its application is not mandatory." *Id*. (citing *Copeland v. Rosen*, 38 F. Supp. 2d 298, 305

(S.D.N.Y. 1999)).  While, if applicable, the inference can support the notion that an adverse

employment action was taken for a reason other than race, that inference can be overcome by

other facts supporting the claim of racial animus.  *See Benedith v. Malverne Union Free Sch.
Dist.*, 38 F. Supp. 3d 286, 319 (E.D.N.Y. 2014) ("Even at the summary judgment stage of
litigation, 'the same-actor inference is permissive, not mandatory, and even if the same
individuals made both decisions [to hire and administer an adverse employment action], the
Court would not be compelled to give [the defendant] the benefit of the inference.'") (quoting
*Memnon v. Clifford Chance US, LLP*., 667 F. Supp. 2d 334, 351 (S.D.N.Y. 2009).

The Complaint asserts more than sufficient factual material to support an inference of
discrimination even if Miller both hired and fired Colbert.  Although it may be possible that
Miller acted for reasons other than race, it is equally or more plausible that Plaintiff's termination
was on account of race either because Miller was not the person who made the hiring decision, or
because having made the hiring decision he developed regrets about the employment of a person
who was "too black" and "culturally different," or for any number of other reasons.  *See
Twombly*, 550 U.S. at 570 (plaintiff need plead "only enough facts to state a claim to relief that is
plausible on its face").  "Decisions in this Circuit addressing [the "same actor" inference] have
warned that its use is not to become a substitute for a fact-intensive inquiry into the particular
circumstances of the case at hand."  *Sklaver v. Casso-Solar Corp.*, 2004 U.S. Dist. Lexis 24934,
at *34, n.16 (S.D.N.Y. May 13, 2004) (citing *Copeland*, 38 F. Supp. 2d at 305 (citing cases)).

In sum, the Court need not decide now whether the "same actor inference" applies here.
Even if it did apply, put simply, and as supported by the cases in this Circuit, the fact that a
company hires an employee knowing he is African-American does not foreclose the plausible
inference that the same company has fired him because he is African-American.

**B.**     **Aiding and Abetting Claims Under NYSHRL and NYCHRL**

Defendants also move to dismiss the aiding and abetting claims against Miller under

NYSHRL and NYCHRL.  NYSHRL makes it unlawful "[f]or an employer, because of an

individual's . . . race . . . to discharge from employment such individual or to discriminate

against such individual in compensation or in terms, conditions or privileges of employment."

N.Y. Exec. Law § 296(1)(a).  An individual is liable as an "employer" under Section 296(1)

"when that individual has an ownership interest in the relevant organization or the power to do

more than carry out personnel decisions made by others," *i.e.*, the power to hire or fire.

*Townsend v. Benjamin Enters., Inc.*, 679 F.3d 41, 57 (2d Cir. 2012) (emphasis added) (internal

quotation marks omitted).  Separately, NYSHRL makes it unlawful for "any person to aid, abet,

incite, compel or coerce the doing of any of the acts forbidden under this article, or to attempt to

do so."  *See* N.Y. Exec. Law §§ 296(6).  NYCHRL provides a similar basis for liability for

aiding and abetting.  Any such claim is analyzed under the same standard as under NYSHRL, as

"the language of the two laws is virtually identical."  *Xiang v. Eagle Enterprises, LLC*, 2020 WL

248941, at *7 (S.D.N.Y. Jan. 16, 2020) (internal quotation marks and citation omitted).

Miller does not dispute that he "actually participated" in the conduct underlying the

discrimination claim, as is required to establish liability under both statutes.  *See Feingold v. New

York*, 366 F.3d 138, 58 (2d. Cir. 2004).  He argues instead that both because he is alleged to be

the sole perpetrator of discriminatory conduct, and because he is also sued as a principal, the

Court must dismiss the aiding and abetting claims.  Both arguments fail.

In *Tomka v. Seiler Corp.*, 66 F.3d 1295 (2d Cir. 1995), the Second Circuit rejected

Miller's first argument.  *Tomka* held that defendants could be found liable under Section 296(6)

even though they were responsible for the underlying conduct giving rise to direct liability for

their employer.  *Id.*; *see Feingold*, 366 F.3d at 157-58 (affirming this holding from *Tomka*).

Likewise, here, the allegation that Miller caused FSA Store to terminate Plaintiff's employment

is sufficient to satisfy 296(6).  Although defendant would limit *Tomka* to the circumstance where

there are multiple defendants each accused of being an aider and abettor, the Second Circuit in

*Tomka* drew no such distinction and this Court is not free to do so.  *See Torres v. New York*

*Methodist Hosp., No.* 2016 WL 3561705, at *13 (E.D.N.Y. Jan. 7, 2016) (collecting cases).

Miller's second argument is readily disposed of.  He argues that "because Plaintiff has

alleged facts that *could* support holding Miller individually liable under Section 296(1) . . . [and

because Miller] may be held directly liable *if* he is shown to have an ownership interest or any

power to do more than carry out personnel decisions made by others," Plaintiff cannot also plead

that Miller is liable as an aider and abettor under Section 296(6).  Def. Reply. 9, Dkt. No. 31

(emphasis added).  The Court need not determine at this stage whether a jury verdict holding

Miller liable both as a principal and as an aider and abettor would be supportable.  It is sufficient

to state that the Federal Rules permit claims to be plead as an alternative, to wit, if Plaintiff fails

to establish that Miller is an owner he is liable as an aider and abettor.  *See* Fed. R. Civ. P.

8(d)(3) ("A party may state as many separate claims or defenses as it has, regardless of

consistency."); *Doe*, 831 F.3d at 48 (same).[1]  The fact that it might plausibly be alleged that

Miller is an owner does not immunize him from potential liability as an aider and abettor.  *See*

*e.g.*, *Eagle Enterprises, LLC*, 2020 WL 248941, at *5 (finding that Plaintiff had "made out a

---

[1] Plaintiff cites *Tomka*, 66 F.3d at 1317 and *Chamblee v. Harris, Inc.*, 154 F. Supp. 2d 670 (S.D.N.Y. 2001) to
support his argument, as in each case the court found defendants liable under one or the other of Sections 296(1) and
296(6), but not under both.  Neither case supports Plaintiff's argument.  Both opinions addressed motions for
summary judgment, and neither case supports the proposition that a plaintiff is precluded from pleading claims
under both Sections 296(1) and 296(6) in the alternative.

prima facie case of NYSHRL discrimination as to [a Defendant] under both the employer and aider and abettor theories of individual liability").

## CONCLUSION

For the foregoing reasons, Plaintiff's motion to dismiss is DENIED.

SO ORDERED.

Dated: April 27, 2020
     New York, New York         _____
                                     LEWIS J. LIMAN
                            United States District Judge